# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

IN RE                              )
                                   )        **Case No. 12-20997-TLM**
**JAMES P. MAREK and**             )
**CARRIE A. MAREK,**               )        **Chapter 13**
                                   )
                    Debtors.       )
_____    )

## MEMORANDUM OF DECISION
_____

**INTRODUCTION**

On August 23, 2012, James A. Marek and Carrie A. Marek ("Debtors")

filed a petition for relief under chapter 13 commencing this case.[1]  Creditors

Killgore Adventures, LLC ("Killgore") and Nick and Mary Troche ("Troche")

(collectively "Movants") have moved under § 1307(c) to dismiss the case or to

convert it to chapter 7.  Doc. No. 51 ("Motion").

Movants contend that cause under § 1307(c) exists and, in particular, that

Debtors' case is filed in bad faith.  They urge the Court to convert the case,

_____

[1]  Unless otherwise indicated, all statutory references to chapter and section are to the
Bankruptcy Code, Title 11, U.S. Code, §§ 101-1532, and all rule references are to the Federal
Rules of Bankruptcy Procedure.   The Court has jurisdiction pursuant to 28 U.S.C. § 1334, and all
issues before it are core matters on which it may enter final decision under 28 U.S.C. § 157.

MEMORANDUM OF DECISION - 1

contending Debtors are not "farmers" and thus eligible under that chapter.[2]

Alternatively, Movants ask the Court to dismiss the case but with "prejudice"

under § 349(a). The prejudice suggested is a two-year bar on any bankruptcy

filing by Debtors.

The Motion was heard on December 5, 2012, and taken under advisement

on January 22, 2013, upon the conclusion of post-hearing briefing.[3]

**FACTS**

**A.    Chapter 12 case**

On September 2, 2011, Debtors filed a voluntary joint chapter 12 petition

commencing Case No. 11-21158-TLM.[4]  In that chapter 12 case, Killgore received

a judgment establishing that a $48,255.00 obligation owed by Debtors was

nondischargeable under § 523(a)(2)(A).  *Killgore Adventures, LLC v. Marek (In re

Marek)*, 468 B.R. 406 (Bankr. D. Idaho 2012) ("*Marek I*").[5]

In June, 2012, this Court issued a decision determining that confirmation of

Debtors' chapter 12 plan would be denied, and that the chapter 12 case would be

---

[2]  *See* § 1307(f).

[3]  This Decision constitutes the Court's findings of fact and conclusions of law under Rules 7052 and 9014.

[4]  The Court takes judicial notice of its files and records, Fed. R. Evid. 201, to establish the background for the instant disputes.

[5]  Ex. 215.  The total debt owed Killgore exceeds $114,000.  *See* Ex. 219 (proof of claim).

dismissed. *In re Marek*, 2012 WL 2153648 (Bankr. D. Idaho June 13, 2012) ("*Marek II*").[6] In *Marek II*, the Court found, among other things, that Debtors were not "family farmers" as that term is defined in the Code, and that Debtors failed to meet the good faith standards under § 1225(a)(3).

### B.    Chapter 13 case

A little over two months after dismissal of the chapter 12 case, Debtors filed the present chapter 13 case. This filing was just a few days before a rescheduled nonjudicial deed of trust foreclosure sale by Troche.[7]

### 1.    The filing, and amendment, of schedules and statements

Bankruptcy debtors are required to fully and accurately list all their assets on schedules A and B, and all their debts on schedules D, E and F. All unexpired leases and executory contracts must be listed on schedule G. Income and expenses must be listed on schedules I and J.[8] All schedules must be verified by debtors, under penalty of perjury, as true and correct to the best of their knowledge, information and belief.[9] Debtors must also file a similarly verified statement of

---

[6] Ex. 213.

[7] *See* Ex. 216 at 36 (noting August 28, 2012, sale date). According to Debtors, Troche is owed over $173,000 and secured by 10 acres of real property owned by Debtors in Idaho County, Idaho, worth $100,000. *Id.* at 17. Troche asserts a total debt over $191,000. Claim No. 12-1.

[8] *See* § 521(a)(1)(B).

[9] *See* Rule 1008.

MEMORANDUM OF DECISION - 3

financial affairs ("SOFA").  Debtors' initial schedules and SOFA were filed on August 23, 2012.  Ex. 216.[10]

Movants conducted Rule 2004 examinations of Debtors that occurred on October 9, 2012.  *See* Ex. 224 (Jim Marek transcript); Ex. 225 (Carrie Marek transcript).[11]  Following those examinations, the chapter 13 trustee, C. Barry Zimmerman ("Trustee"), filed an October 26 report indicating that, in his view, Debtors were required to amend their schedules to comport with the evidence and testimony developed in those Rule 2004 examinations.  Doc. No. 56.

The Court at a hearing on November 6, 2012, continued consideration of confirmation of Debtors' chapter 13 plan until December 5.  It also required disclosure of all proposed exhibits and identification of witnesses by November 28.  Doc. Nos. 57, 58.

Despite the disclosures in the October 9 examinations, and Trustee's October 26 request, it was not until November 28 that Debtors filed amended schedules B, I and J, and an amended chapter 13 plan.[12]  Among other things, the attachments to the amended schedules and amended plan substantially changed

---

[10]  Details from all Debtors' schedules and amended schedules will be discussed further below.

[11]  A Rule 2004 examination of Jim Marek's mother, Peggy Marek, also occurred that day.  Ex. 221.  Peggy Marek is an "insider" of Debtors under the Code.  *See* § 101(31)(A)(i).

[12]  Doc. Nos. 69, 75.

MEMORANDUM OF DECISION - 4

Debtors' projected post-petition income.  Given the lateness and nature of these

amendments, and presence of the newly amended plan, the Court denied

confirmation of the previously-filed plan and thus vacated hearing on confirmation

issues set for December 5.  But the Court ordered that hearing on the Motion

would still occur on December 5 as previously set.  Doc. No. 78.

The hearing occurred and, as noted, the Motion was taken under

advisement subject to post-hearing written closing arguments.  However, after

Movants' closing arguments were filed[13] and simultaneously with their own

closing arguments on January 14, 2013, Debtors filed further amended schedules

A, B, C, D, I and J and an amended SOFA.  Doc. No. 92.  Debtors also filed a

further amended chapter 13 plan.  Doc. No. 91.

### C.    Specific factual issues

Throughout this case, and indeed in the prior chapter 12 case, there have

been numerous issues as to the accuracy and completeness of Debtors' schedules

and statements.  In addition to the filings with the Court, and serial amendments to

those filings, Debtors were examined about these issues, both at the October 9

examinations and at the December 5 hearing. It assists understanding of the facts

and evidence, and related legal issues, to separate certain of these matters.

---

[13]  Movants' briefs were filed on December 19, 2012.  Doc. Nos. 87, 88.

MEMORANDUM OF DECISION - 5

### 1. Real property

#### a. Ownership of 10 acres

Debtors disclosed in their chapter 12 case ownership of or interest in only one parcel of real property, the 10 acres in Idaho County securing Troche. Ex. 201. They initially claimed it was worth $70,000. *Id.* They amended their schedules to reduce the alleged value to $20,000. Ex. 202. In the initial chapter 13 schedules, Debtors alleged its value was $100,000. Ex. 216.[14]

#### b. Leases

#### i. Peggy Marek

Debtors' initial chapter 12 filing showed no unexpired leases of real property on schedule G. However, their schedule J expenses showed a $497/month rent or mortgage payment expense. Ex. 200. In an amended chapter 12 schedule G, Debtors indicated they had a "residential lease, including storage areas for Debtors' equipment and animals" with Peggy Marek, but disclosed no payment terms. Ex. 202. A similar disclosure is in the chapter 13 initial schedule G. Ex. 216.

Peggy Marek testified in her Rule 2004 examination, and at the December hearing, that she lives on a 1542 acre ranch, and that Debtors have lived on her

---

[14] Debtors' chapter 13 plans, Doc. Nos. 69 (Nov. 28, 2012) and 91 (Jan. 14, 2013), propose payment to Troche of $100,000 at 5% interest through five annual payments.

MEMORANDUM OF DECISION - 6

property for at least five years, and are obligated to pay $1,500 per year for pasture

rent and $450 per month for house rent. It appears some of this obligation is

"paid" through Debtors' physical labor on the ranch or their provision of trucking

services for Peggy Marek's benefit. However, some payments are evidently made

in cash. Ex. 221 at 30-31, 53-54. None of the SOFAs filed by Debtors show any

payments to Peggy Marek for rent, though their original and amended schedule J

showed a $497 per month rent or mortgage expense. However, the January, 2013

amended schedule J changed the rent to "$0.00."

### ii.    Other pasture leases

Testimony established that Debtors regularly entered into other leases of

real property, mostly if not exclusively for purposes of pasture for livestock. For

example, Peggy Marek indicated that certain of the sheep were on a pasture "at

Winchester" in May, 2012 and then moved to the Orofino area over the summer

time frame, just prior to the chapter 13 filing. She did not know who provided the

pasture as Jim Marek "took care of it." She also indicated that Debtors had Angus

cows on property they rented from Fred Hopp.

Jim Marek indicated Debtors were involved in a lease of land with Eric

Hasslestrum. He also testified there was an "oral lease" for ground where the

lambs were in the fall of 2012. At trial he admitted this lease was with Bill Regan,

though he conceded that he had refused to provide the name of this party during

MEMORANDUM OF DECISION - 7

the 2004 examination.

No leases of pasture were ever disclosed on any schedule G.

### c.    Remainder interest in the Marek Ranch

Peggy Marek's husband, Jack, died in 2000.  His will, Ex. 222, provides that his interest in the Marek Ranch goes to Peggy Marek for her lifetime with the remainder divided among his four children as tenants in common.  Debtor Jim Marek therefore has a 1/4 reminder interest in the Ranch, and was so informed of that fact in 2001.  Ex. 223.  Debtor's interest in this real property was not disclosed either as real estate (schedule A) or as an interest under a decedent's estate (schedule B item 20) in the chapter 12 case.  It was not disclosed in the chapter 13 case until the January 14, 2013 amendments, which followed examination of Jim and Peggy Marek about this issue at the December 5 hearing.

### 2.    Vehicles

Debtors disclosed a 2003 Dodge 3500 pickup, a 2005 Peterbilt, and a 2003 Wilson trailer in their first chapter 12 schedules.  Ex. 200.  In an amended chapter 12 schedule B, they added a 2002 Toyota Tacoma.  Ex. 202.  The same vehicles were listed in the initial chapter 13 schedules.  Ex. 216.[15]

On July 16, 2012, shortly after the June, 2012, dismissal of the chapter 12

---

[15]   The chapter 13 filing indicated that the 2003 Dodge 3500 pickup had been repossessed on July 12, 2012.  *Id.*

MEMORANDUM OF DECISION - 8

case and only one month before the chapter 13 filing, Debtor Carrie Marek and

Peggy Marek jointly purchased a 2011 Dodge 3500 pickup, securing that

obligation with a lien in favor of Potlatch #1 Federal Credit Union ("Potlatch").

Ex. 227.[16]  They are expressly co-borrowers under the lender's documents.  Carrie

Marek was the one who placed the written order for purchase with the vehicle

dealer.  *Id.* at 7.

This vehicle was not disclosed in Debtors' chapter 13 schedules, Ex. 216,

nor in the November 28, 2012, amendments, Doc. No. 75.[17]  The obligation to

Potlatch was not disclosed.  Schedule H was marked to show that there were no

obligations with guarantors, co-signers or codebtors.   No provision for this debt

was made in Debtors' plans.

After the December 5 hearing, where this issue was addressed in

examination, no amendments were made for over a month.  Debtors' January 14

amendments disclosed Debtor's interest in the 2011 Dodge on schedule B, and

Potlatch's claim on schedule D.  But these amendments state the vehicle was

"purchased by, and paid by, Peggy Marek."  Doc. No. 92.  This is directly

contrary to Peggy Marek's testimony at the hearing, which was that she merely

"helped" Carrie Marek get the truck, that Carrie is making the payments on it, and

---

[16]  Ex. 227 is Potlatch's proof of claim, which was filed on November 30, 2012, about a week before the hearing.

[17]  The November 28 amendments added a 1993 Ford van and a 1992 Toyota pickup.  *Id.*

MEMORANDUM OF DECISION - 9

that Peggy Marek has not made any payments.[18]

Debtors provided no explanation, much less a credible explanation, for omission from the chapter 13 schedules of the 2011 Dodge vehicle and Potlatch obligation, acquired and financed only one month before filing.

### 3.    Sheep, and the 2012 transfer to pay Peggy Marek's debt

In the chapter 12 case, Debtors claimed to own no animals, livestock or otherwise. Ex. 200. However, they indicated prior income was generated both by trucking livestock for others, and also by raising livestock, particularly cattle. Debtors professed to be getting out of the cattle business. They also indicated they would buy cattle, goats and sheep, raise them to marketable size, and resell them. Ex. 201 at 5. As noted in *Marek II*, the lack of amendments to schedule B indicated that all livestock being used to generate income in the chapter 12 were acquired by Debtors post-petition. Ex. 213 at 5. Even then, that Debtors owned any livestock was not clear, as most of the testimony indicated or suggested that others owned the livestock, and Debtors would merely get a "share of the gain" in the value of the animals while they were under Debtors' care and in recognition of

---

[18]   Peggy Marek indicated that Carrie Marek would use Peggy's sheep trailer and generate hauling income, and such income was the source of the payments to Potlatch. As with most testimony in this case, details are not clear and there are no corroborating documents. But Debtors' assertions in closing arguments do not attempt to finesse who owed whom or who wrote checks to Potlatch. Rather, Debtors unequivocally assert that Peggy makes all the truck payments and lets Carrie drive it. Doc. No. 93 at 3, 4, 6. This is contrary to the testimony.

MEMORANDUM OF DECISION - 10

Debtors' labors.  *Id.* at 1-12, 18-21.[19]

In filing the chapter 13, Debtors again asserted that they owned no livestock or other animals. Ex. 216.[20]  They did indicate, on schedule G, that they had a "share" (or "joint venture") agreement with Peggy Marek for raising sheep. *Id.* at 28.  This indicated — particularly in light of what was testified to in the chapter 12 case — that others (*e.g.*, Peggy), not Debtors, owned the livestock which would be used to generate income.[21]

During the Rule 2004 examinations in October, 2012, Peggy Marek testified that Jim Marek obtained sheep in payment for his trucking services and that, after he so acquired sheep, he subsequently transferred to her, in 2012, a total of 600 ewes in satisfaction of a pre-existing debt that Debtors owed her.  Ex. 221 at 34-41.  Her testimony at hearing on December 5 was consistent, and established that all such animals were transferred to her in 2012 and prior to May 1, 2012.[22]

---

[19]  In the May 8, 2012, chapter 12 hearing, Jim Marek testified that all of the animals were owned by Peggy Marek. Ex. 220 at 9.

[20]  Debtors, however, also disclosed no possession, as of filing the chapter 13, of livestock owned by third parties. *Id.* at 38 (SOFA, question 14).

[21]  In the May, 2012, chapter 12 hearing, Jim Marek testified that Peggy Marek purchased 600 ewes from third parties and expressly not from Jim Marek. Ex. 220 at 17-18. Jim Marek only helped "put the deal together" for Peggy Marek. *Id.* at 21.

[22]  The dates are significant for two reasons. First, Debtors' chapter 12 case commenced in September, 2011 and was dismissed in June, 2012. Thus, all the transfers in payment of the debt to Peggy Marek occurred during the case and without disclosure, notice, a confirmed plan, or other Court approval. Second, May 1, 2012, was the date of the sole written agreement between Debtors and Peggy Marek concerning the "share agreement" for later division of the

(continued...)

MEMORANDUM OF DECISION - 11

She testified that this transfer partially paid her outstanding debt of $48,000 which was generated from 2008 through 2011 and represented what Debtors owed her for back rent, horse pasture and Debtors' bills that she paid.[23]  She stated, however, that she forgave the balance of the debt for the $40,000+ worth of animals she received.  She also testified that Jim Marek came up with the idea, and asked if he could pay the debt by transferring the ewes to her.  She then helped figure out that 600 head at $70 per head would be about $42,000.[24]

In the November 28 amendments, Debtors disclosed on schedule B a "partnership" interest with Peggy Marek under which 600 ewes would be bred and Debtor's entitled to 70% of the lamb crop.  It asserts that Peggy Marek owns the ewes.  Doc. No. 75 at 3.  The SOFA was not amended.

Only in the January 14, 2013 amendments was Debtors' SOFA changed to disclose the transfer to Peggy Marek, at "various times" in 2012, of 800 head of ewes in satisfaction of a $40,000 debt.  Doc. No. 92 at 13 (response to question 10).

---

[22] (...continued)
"gain" on "Peggy's" sheep.  Ex. 216 at 43 (copy of agreement); *see also* Ex. 213 at 21 (discussing this agreement, created just days prior to the May 8 dismissal hearing in chapter 12).

[23]  Peggy Marek was never listed as a creditor in the chapter 12.

[24]  At the Rule 2004 examination, she explained that only 582 head were actually delivered due to some losses.  Ex. 221 at 38.

MEMORANDUM OF DECISION - 12

4.      **Other animals**

As noted, the chapter 13 filing disclosed no ownership of animals of any

kind.  *See* Ex. 216 at sched. B.[25]  The November 28 amendment disclosed 62 head

of cattle (19 Longhorns and 43 beef cows) worth $86,000, and a brood sow pig.

Doc. No. 75 at 4.[26]  The January, 2013, amendments added 34 beef calves (worth

$27,200), 4 young pigs, and a jackass.[27]  Doc. No. 92 at 5-6.

At the hearing on December 5, Jim Marek testified that — as he had

conceded in the October examination — he personally owned since May or June,

2012, some 27 head of cattle bearing his brand.  He acquired these animals from

an individual (Jensen) through an agreement to trade trucking and feeding services

for the cattle.  The 27 head of cattle were acquired in May and June, 2012, not

long before the filing of the chapter 13.  He admitted all were omitted from

schedule B in the chapter 13 filing.  Under examination, he seemed to indicate that

they were not disclosed because, at the time of filing, he didn't yet "own them"

because he was still trucking in order to finish paying them off.  During the

chapter 13, Debtors finished paying Jensen, apparently through provision of labor

---

[25]  *But see id.* at scheds. I, J, where projections suggested at least possession of and
interest in, if not ownership of, livestock.

[26]  Peggy Marek testified that she owned 35 head of Longhorn or Longhorn-cross cattle.
On the whole of the evidence, these are different from those Longhorns belatedly scheduled by
Debtors.

[27]  At the December hearing, Jim Marek also testified that Debtors owned 13 donkeys, 3
or 4 sows, and a boar at the time of filing the chapter 13.

MEMORANDUM OF DECISION - 13

or services.[28]

Jim Marek also conceded that he owned several bulls in June, 2012.  None were disclosed.  He later sold 7 bulls through a "swap out" and applied the value to a debt owned Jensen.  At the time of the filing, Debtors owed Jensen, and Jensen owed Debtors on a feed bill.  Neither the debt nor the receivable was disclosed.

### 5.    Income

In filing the chapter 13, Debtors answered their SOFA question regarding gross annual income by stating that they had $0.00 for 2012 through the August filing date, $47,962 for 2011, and $44,812 for 2010, the latter two being livestock and trucking combined.  Ex. 216 at 34.  However, in their attachments to schedules I and J and to the plan,[29] they projected for the one year period starting August, 2012, cattle sales of $26,300, sheep sales of $77,500, and trucking income of $32,300.  The total income for the first year of the chapter 13 was $181,748.  Predictably, Movants questioned Debtors closely on these projections.

On November 28, in the amendments just before the hearing on the Motion, Debtors revised the projections, showing $10,091 for cattle sales, $144,099 for sheep sales, and $122,972 for trucking income, and total first year chapter 13

---

[28]  Debtor testified that there were people, including but not limited to Jensen, who were not "included" in the bankruptcy (*i.e.*, disclosed as creditors) because "they didn't want to be."

[29]  Ex. 216 at 10; Ex. 217 at 10.

MEMORANDUM OF DECISION - 14

income of $285,212.[30]

Debtors failed to credibly support the revised projections through evidence at hearing.

### 6.    Records

Debtors' haphazard approach to keeping records, and their lack of willingness to disclose them as part of the bankruptcy process, was at the heart of the chapter 12 case.  *See Marek II*.  While it appears that Debtors have provided Movants some additional documents and information over what they were willing to share in the chapter 12, the basic problems have never been rectified.

Debtors operate on, in effect, a cash basis.  However, they keep no books of account, nor other documents from which the nature of their affairs and the details of their transactions can be ascertained, tracked or corroborated with any degree of certainty.  They do not use a personal checking account, and suggested this was due to their concern it would be garnished by Movants.  They have used, at times and for limited purposes, a bank account in the name of YO Livestock, LLC, a solely-owned entity that was discussed briefly in *Marek II*.[31]

Beyond the cash basis of their business, however, is the problem that virtually all the transactions Debtors undertake are oral, and have no

---

[30]  Doc. No. 69 (amended plan) at 11; Doc. No. 75 (amended schedules) at 9.

[31]  *See*, *e.g.*, Ex. 224 at 63-65; Ex. 213 at 3, n.6.

MEMORANDUM OF DECISION - 15

contemporaneous writings at all.  The testimony establishes that many of the transactions are "swaps" or "trades" of Debtors' services in return for animals or interests in animals, some of which interests will be realized only later when animals or their offspring are sold (some being the "share of gain").  The services Debtors provide can include trucking, feeding, pasturage, or assistance in arranging optimum sales locations and times.  But the testimony of Debtors as to the details of these arrangements is consistently vague and imprecise.  And none of the arrangements are easily susceptible of verification.

Debtors' resistance to providing any detail as to the identity of the parties they do business with or the nature, details or terms of the deals they have arranged, was an issue at the heart of *Marek II*.  Though that resistance has lessened somewhat, it remains impossible to determine what has transpired financially over the course of Debtors' two bankruptcies.  This is a matter of significance not only because of questions as to the propriety of past conduct, but because Trustee and creditors are being asked to allow Debtors to confirm and perform a business chapter 13 plan that posits an ability to generate over $285,000 in revenue yearly.[32]

---

[32]  The January 14 amended chapter 13 plan proposes *de minimis* monthly payments of $100 over 60 months, supplemented by a $29,000 payment each fall and a $57,000 payment each spring.  The plan's attachments show estimated yearly revenue over $285,000.  Doc. No. 91.  As Trustee effectively observed, Debtors' lack of bank accounts and bookkeeping records makes it impossible to run a business chapter 13 of this magnitude.

MEMORANDUM OF DECISION - 16

**DISCUSSION AND DISPOSITION**

    **A.    Section 1307(c) and related authorities**

Under § 1307(c), the Court may convert a chapter 13 case to one under

chapter 7, or dismiss it, for "cause." Several grounds constituting cause are listed

in § 1307(c), but it is well-established that these are illustrative only and not

exclusive. *de la Salle v. U.S. Bank, N.A. (In re de la Salle)*, 461 B.R. 593, 605

(9th Cir. BAP 2011); *Ellsworth v. Lifescape Medical Assocs., P.C. (In re

Ellsworth)*, 455 B.R. 904, 914 (9th Cir. BAP 2011).[33] Even though it is not

specifically mentioned in § 1307(c), the bad faith filing of a petition is also

"cause" for conversion or dismissal. *Ellsworth*, 455 B.R. at 915, 917-18 (citing

*Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir. 1999)); *Ho v. Dowell

(In re Ho)*, 274 B.R. 867, 876 (9th Cir. BAP 2002); *see also de la Salle*, 461 B.R.

at 605-06. To find such bad faith, the Court must examine the "totality of the

circumstances," *de la Salle*, 461 B.R. at 605-06 (citations omitted); *Ellsworth*, 455

B.R. at 921 (bad faith may be inferred from the totality of the surrounding

circumstances). In such an analysis, the Court examines factors including (1)

misrepresentation of fact; (2) unfair manipulation of the Code; (3) history of

filings and dismissals; (4) attempts to defeat state court litigation; and (5)

egregious behavior. *Ellsworth*, 455 B.R. at 917-18 (citing *Leavitt*, 171 F.3d at

---

    [33] *See also* § 102(3) (rule of construction of phrases "includes" and "including").

MEMORANDUM OF DECISION - 17

1224).

This Court has concluded that the burden of establishing cause to dismiss or convert for bad faith lies on the party or parties moving under § 1307(c), here Movants. *In re Cluff*, 2012 WL 1552391 at *3 (Bankr. D. Idaho Apr. 30, 2012).[34]

Motions under § 1307(c) trigger a two-step process. First, the Court must determine whether cause has been proven. If so, it must then make a choice between converting the case to a liquidation under chapter 7 (if the debtors are eligible) or dismissing the case, whichever is in the best interests of creditors and the estate. *See* § 1307(c); *de la Salle*, 461 B.R. at 605 (citing *Nelson v. Meyer (In re Nelson)*, 343 B.R. 671, 675 (9th Cir. BAP 2006)).

Further, the Court has the ability to dismiss the case "with prejudice." *Ellsworth*, 455 B.R. at 921 (citing § 349 and *Leavitt*, 171 F.3d at 1223; other citations omitted). Prejudice "does not have a single, universally-accepted meaning." *Id.* (citing *Colonial Auto Ctr. v. Tomlin (In re Tomlin)*, 105 F.3d 933, 938-99 (4th Cir. 1997)). It can range from recognition of the 180-day bar on refiling under § 109(g) to a total preclusion of ever attempting to discharge debts

---

[34] This Court noted in *Cluff* that there are authorities placing the burden on the debtor to show that the chapter 13 petition was filed in good faith and the chapter 13 plan proposed in good faith, and that even in the § 1307(c) dismissal context, the debtor bears such burden. *Id.* (citations omitted). It also noted that the BAP in *Ellsworth* raised, but ultimately did not need to resolve, the issue of placement of the burden. *Cluff* concluded that, consistent with the majority of courts considering the question, "the burden of showing that a case was filed in bad faith so as to require conversion or dismissal under § 1307(c) falls on the party seeking such conversion or dismissal." *Id.* (citations omitted).

MEMORANDUM OF DECISION - 18

that would have been discharged had the plan been confirmed and completed. *Id.*

But it may also fall between those poles:

> When the court is considering dismissal with prejudice, the second step of this two-step process ordinarily should include consideration of whether some sanction less than dismissal with prejudice would be sufficient. For instance, aside from dismissing with prejudice, a court might consider barring the debtor from refiling for 180 days pursuant to § 109(g), or for some other length of time. Alternatively, a court might consider indefinitely barring relief to the debtor only under certain chapters of Title 11.

*Id.* at 922.[35]

### B.    The issues with Debtors' schedules and assertions

Schedules filed by debtors have evidentiary import. Fed. R. Evid. 801(d)(2); *In re Hobart*, 452 B.R. 789, 792 n. 4 (Bankr. D. Idaho 2011). Though amendments to schedules may be made, *see* Rule 1009(a), doing so does not render the prior filings a nullity. *In re Roots Rents, Inc.*, 420 B.R. 28, 40 (Bankr. D. Idaho 2009) (citing *In re Kaskel*, 269 B.R. 709, 715 (Bankr. D. Idaho 2001); *In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001)). *Roots Rents* quoted from *Bohrer*:

---

[35] *Ellsworth* emphasized that dismissal with prejudice is a severe remedy, and that care should be taken to ensure that due process concerns are satisfied. 455 B.R. at 922-23. In *In re Lehr*, 479 B.R. 90 (Bankr. N.D. Cal. 2012), the court recognized this, but held that the "two-step process" did not require two hearings, where the movant's request for a dismissal with prejudice was clearly stated, the debtors placed on notice, and the parties proceeded to trial on all issues. *Id.* at 100; *see also Ellsworth*, 455 B.R. at 923 n. 13 (noting the second step does not invariably require a second hearing, and whether bifurcation is necessary or appropriate rests in the discretion of the court). Here, Movants specifically invoked § 349 and requested a two-year bar on refiling, and all issues under the motion were tried at a regularly conducted evidentiary hearing on December 5, 2012. No separate hearing was or is required.

MEMORANDUM OF DECISION - 19

> Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions. [ ] When schedules are amended the old schedules do not, as Bohrer seems to argue, become nullities. The only effect of amendment of a schedule is that the original schedule no longer has the binding, preclusive effect it might otherwise have. It is still fully subject to consideration by the court as an evidentiary admission.

*Id.* (quoting *Bohrer*, 266 B.R. at 201; internal citations omitted).

The accuracy or inaccuracy of the schedules and statements filed by debtors is often a matter of significant consequence. For example, it can result in potential loss of discharge under § 727(a).[36] The duty to be fully candid, truthful, complete and accurate is beyond cavil. This Court has observed that "financial disclosure is a *sine qua non* for bankruptcy relief." *Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 2003 WL 21981707 at *9 (Bankr. D. Idaho July 17, 2003).

As set out at length above, Debtors have throughout the chapter 12 and, now, this chapter 13 case, failed to meet the obligation of full, complete and forthright disclosure. To be clear, the Court concludes that this is not just an issue of cavalier attitude or uncaring focus on accuracy. The very nature of the omissions, and the fact that amendments are made only after Movants ferret out the actual facts, allows an inference of deception and concealment.

---

[36] *See, e.g.*, *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987), quoted in *Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 502-03 (Bankr. E.D. Cal. 2001) ("Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming. The record in this case shows, at the very least, cavalier indifference and a pattern of disdain for the truth. Meaningful disclosure was accorded too low a priority.")

MEMORANDUM OF DECISION - 20

The concealment in the chapter 12 was blatant; Debtors acknowledged that they would not provide names of individuals they did business with or the financial details of such business.  That was found to be improper when Debtors were seeking the benefits of bankruptcy relief, and supported the dismissal of that case.  *See Marek II*.

But what occurred since belies the idea that Debtors are now willing to be open and transparent in their financial dealings.

They never disclosed the transaction under which they obtained the 2011 Dodge 3500 pickup, despite entering into that arrangement only one month before filing the instant case.  They maintain that Peggy Marek has and does make all the payments, though her testimony was to the contrary.

Debtors steadfastly took the position that others, and particularly Peggy Marek, own the livestock, and that Debtors' income is only through "gain" in value which they split with the livestock owner in recognition of the pasturage, feeding, trucking and other services Debtors provide.  They failed to disclose — until well after the testimony at hearing and after Movants' closing briefs were filed — that they had owned and transferred 600 head of ewes to Peggy Marek, during the chapter 12 case, in satisfaction of pre-existing debt.

They failed to disclose ownership of other livestock, until the facts were developed by Movants through discovery and presented at hearing.  They did not disclose the remainder interest in the Marek Ranch under Jack Marek's will.

MEMORANDUM OF DECISION - 21

It is true that amendments to schedules and statements have been made. But they were not done proactively. Rather, they were only reactively made once Movants established the details of the material omissions. So, while amendments are often made, and certainly should be made when debtors discover errors, that they were eventually made here does not remedy the problem.

Debtors were made aware, in the chapter 12 case, that Movants — both owed sizeable obligations — would be diligent and carefully evaluate Debtors' assertions and financial activity. Yet the approach to the chapter 13 case was little better than that in the chapter 12. The nature and magnitude of the omissions in the present case evidences a continuation of the behavior that led to the dismissal of the prior case.

The Court has considered the totality of the evidence. It has considered carefully the testimony of Debtors as well as what they have filed. It has considered the credibility of Debtors, and the weight to be given their testimony, especially in light of other, contradicting evidence.

It is beyond debate that some debtors come into bankruptcy with poor records. Inadequate, spotty or even nonexistent record-keeping is often at least a symptom, if not a cause, of financial difficulty. And the Court has seen debtors who, for whatever personal or cultural reasons, do a lot of their financial dealings through trades, barter, offsets, oral agreements and similar hard-to-document and hard-to-verify approaches.

MEMORANDUM OF DECISION - 22

The Court has thus considered carefully whether this informal approach to business and personal finances provides some credible defense or explanation in Debtors' case.  It concludes that it does not.  Even if oral trades and similar informal, undocumented agreements are part of the environment in which Debtors previously conducted their ranching and trucking businesses, their insistence on continuing that approach in the instant bankruptcy reorganization is unacceptable.[37]

There is no credible assertion of naivete, given Debtors' experience with these Movants.  They were on notice that the quality and quantity of records was of critical import and would be placed at issue.  There is further no way to reasonably believe that a business reorganization of the magnitude here, with over $285,000 in projected yearly revenues, could be confirmed or thereafter monitored and administered by a chapter 13 trustee with records and accounting approaches of the sort demonstrated here.

Debtors have misrepresented facts in their submissions, and the same are not excused or erased by later amendments coerced by creditor discovery or impeachment.  That factor under *Ellsworth* and the related case law is met.

---

[37]   The Court obviously found problems in the chapter 12 case, as discussed in *Marek II*. However, giving Debtors the benefit of the doubt, it has looked to conduct in the chapter 13 case with an eye toward whether Debtors were willing to make the changes in how they operate their business in light of what they learned through the chapter 12 process and in consideration for the bankruptcy benefits they seek.  Their resistance to changing that behavior, and the nature of the specific disclosure and conduct problems outlined herein, persuade the Court that it is not simply a matter of "not knowing any better."

MEMORANDUM OF DECISION - 23

Debtors' first bankruptcy filing followed a state court fraud judgment for Killgore and an attempted foreclosure by Troche. The second bankruptcy soon followed dismissal of the first, and was on the eve of Troche's renewed foreclosure. The factor related to Debtors' history of filings and dismissal is likewise met.

The reasons for the dismissal of the first case are significant, and laid out in *Marek II*. The manner in which Debtors have approached the present reorganization manifests unfair manipulation and inequitable treatment. Creditors have been put to considerable expense to develop the factual detail of Debtors' assets, liabilities and financial dealings — details that Debtors were obligated to have provided as *quid pro quo* for bankruptcy relief. Under the totality of the evidence, the Court concludes that egregious behavior has been established.

These conclusions establish that cause exists under § 1307(c) including bad faith. Thus conversion or dismissal is warranted.

In considering what remedy is appropriate, and given the nature of Debtors' assets and liabilities and how a trustee might or could approach them, the Court determines that dismissal rather than a chapter 7 liquidation is in the best interests of creditors and the estate.[38]

The next question concerns the terms of the dismissal. Movants have

---

[38] This obviates the need to address whether Debtors are presently "farmers" and thus not subject to such conversion under § 1307(f).

MEMORANDUM OF DECISION - 24

requested that such a dismissal be with prejudice under § 349, and that Debtors be barred from filing for bankruptcy relief for two years. The Court concludes, under the authorities noted, and the totality of the evidence and circumstances, that this severe remedy is warranted and appropriate here. The request will be granted.

**CONCLUSION**

For the above reasons and on these findings and conclusions, the Motion will be granted, and this case dismissed with prejudice, Debtors being barred from refiling for a period of two years. Movants shall provide a form of order in accord with this Decision.

DATED:  February 22, 2013

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 25